# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**ALEC G. SOHMER**                           Chapter 7
    Debtor                              Case No. 06-14073-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~

**COMMONWEALTH OF
MASSACHUSETTS,**
    Plaintiff
v.                                           Adv. P. No. 06-1433
**ALEC G. SOHMER,**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~

**UNITED STATES TRUSTEE**,
    Plaintiff
v.                                           Adv. P. No. 08-1127
**ALEC G. SOHMER**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Second Amended Complaint filed by the
Commonwealth of Massachusetts, through its Attorney General, Martha Coakley.
Together with the United States trustee, the Commonwealth seeks, *inter alia,* the denial of
Alec G. Sohmer's discharge pursuant to 11 U.S.C. § 727(a)(2), (3), (4), and (5).  On August
28, 2009, this Court granted the Joint Motion to Sever and Conduct Trial on Plaintiffs'

1

Claims pursuant to 11 U.S.C. § 727.  The Commonwealth and the United States trustee (collectively, the "Plaintiffs") asserted, and the Court agreed, that trial on the claims arising under 11 U.S.C. § 727 would promote the interest of judicial economy as the Commonwealth's claims under 11 U.S.C. § 523(a) would be rendered moot if the Plaintiffs prevailed on the claims under 11 U.S.C. § 727.  As a result of the August 28, 2009 order, the Court conducted a three and one-half day trial beginning on February 23, 2010 and concluding on March 10, 2010 with respect to the Count I of the Second Amended Complaint.

At the trial, three witnesses testified: Alec G. Sohmer ("Sohmer" or the "Debtor"), Harold B. Murphy, Esq., the Chapter 7 Trustee of the Debtor's bankruptcy estate (the "Trustee"), and Craig R. Jalbert, CPA, the Trustee's accountant ("Jalbert"), and 48 exhibits were introduced into evidence.  The issues presented include whether the Debtor concealed property of the estate, failed to maintain accurate, complete, and reliable books and records, or made false oaths or accounts in connection with his case.  Documentary evidence submitted by the Plaintiffs, together with the stipulated facts set forth in the parties' Joint Pre-Trial Memorandum, substantiate the Plaintiffs' claims that the Debtor omitted bank accounts, investment accounts, contingency fee agreements and rights thereunder, and certain transfers from his Schedules of Assets and Statement of Financial Affairs.  Thus, the outcome of the adversary proceeding depends in large part on the viability of the defenses raised by the Debtor, including lack of any fraudulent intent.  The Court now makes its findings of fact and conclusions of law in accordance with Fed. R.

Bankr. P. 7052.

## II. FACTS

    A. <u>Background</u>

    The Debtor, an attorney who concentrated his practice in bankruptcy law, filed a voluntary Chapter 11 petition on November 6, 2006.  His Schedules and Statement of Financial Affairs, as well as other documents were initially due on November 22, 2006.  On November 20, 2006, however, the Debtor, following the appointment of Harold B. Murphy Esq. as Chapter 11 Trustee on November 15, 2006, moved on an emergency basis to convert his Chapter 11 case to a case under Chapter 7.  As grounds for his motion, he stated:

> Section 1115(a)(2) of the Bankruptcy Code provides in pertinent part, that "property of the estate includes . . . (2) earnings from services performed by the debtor after the commencement of the case but before the case is converted to a case under chapter 7 . . ."  Any delay in converting his case to one under Chapter 7 imposes upon the Debtor involuntary servitude in violation of the Thirteenth Amendment of the Constitution of the United States of America."[1]

    The Court granted the Debtor's Motion to Convert on November 20, 2006, and set a new deadline of December 5, 2006 for filing Schedules and the Statement of Financial Affairs.  After obtaining an extension of time, the Debtor filed his Schedules, Statement of Financial Affairs and other required documents on December 22, 2006, and the Trustee conducted the section 341 meeting of creditors on January 17, 2007.  The Debtor never filed

---

[1] Section 1115 of the Bankruptcy Code was added by the Bankruptcy Abuse Prevention Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (April 20, 2005). The Court takes judicial notice of the Debtor's Motion to Convert.  *See* <u>In re Hyde</u>, 334 B.R. 506, 508 n.2 (Bankr. D. Mass. 2005).

3

amended Schedules or an Amended Statement of Financial Affairs.

A 1991 graduate of Villanova School of Law, the Debtor practiced as Alec G. Sohmer & Associates in Brockton, Massachusetts and, together with Andrew Palmer, Esq., as a partner in a partnership known as Palmer Sohmer LLP in Norwell, Massachusetts.  In addition to handling consumer bankruptcy cases, the Debtor's law practice included representation of individuals with personal injury claims.  The Debtor resigned from the Massachusetts Bar on August 31, 2009.

B. The Timeless Funding Program

In the two-year period preceding the filing of his bankruptcy petition, the Debtor, in addition to practicing bankruptcy and personal injury law, conceived and implemented, through a Nevada corporation known as Timeless Funding, Inc. ("Timeless Funding"), a foreclosure rescue program.  He described and characterized the program as follows:

> As a bankruptcy practitioner doing most[ly] Chapter 7s and Chapter 13s I would - - and this is back in approximately 2004 when the idea originated, we were in an increasing housing market, and I was noticing that people were still losing their homes to foreclosure, and I didn't understand why that was necessary.  I thought it would be - - one would be able to do a mathematical formula to salvage a home's equity in an increasing . . . housing market.

> I recognized that when people are in the midst of the foreclosure or in a bankruptcy I - - a perspective [sic] buyer would not buy market rate, but if you were able to take the house out of - - even in foreclosure, or take the house out of the bankruptcy, you would be able to then sell the house at the market rate, and the person would be able to capture their equity.

> A number of my clients came to me with situations similar to Timeless Funding, but based on the program that they brought me, it didn't make mathematical sense.  There was no upside to the homeowner; and I would

4

say that.  I said, "There's no real upside here," but it made me think there must be a way to create it so that a homeowner could sell their house, take their equity, and then do whatever is necessary if they have to get back on their feet to either rent or downsize or do whatever, in an increasing housing market I couldn't - - I thought it was a shame for people to lose their homes.

***

 To lose  - - to lose specifically the equity in their home.  It was always recognized that they might have to sell the home, that that may be  - - in order to save the equity you have to sell the home.  So the Timeless Funding program was conceived out of that . . . .[2]

As a result of participation in the program, 25 individual or joint homeowners were divested of title to their residential real properties, which, as the Debtor recognized, they may have lost to foreclosure in any event.

The mechanics of  the Timeless Funding program were not uniform for each of the 25 individuals or couples who participated, some of whom were Sohmer's bankruptcy clients.   The transactions did have a number of elements in common, however. Participation in the program required, among other things, the execution of a purchase and sale agreement by the property owner(s); the execution of an Interim Ownership Agreement; the conveyance of the distressed property from the property owner(s) to the Debtor (or to a nominee trust he controlled, his spouse, Jennifer Sohmer, or his brother, Bradley Sohmer) in conjunction with the acquisition of mortgage financing by the purchaser with the concomitant satisfaction of existing liens and encumbrances on the

---

[2] Whether Sohmer's characterization of the Timeless Funding program as an altruistic endeavor is accurate or whether the program was simply a fraudulent scheme to strip  homeowners of the equity in their residences is not germane to the issues before the Court.

property; the payment of a $15,000 fee to Timeless Funding by the property owner(s); and the creation of and, in some cases conveyance to, a nominee trust to hold title to the property. Once the transactions were completed, the property owners, in theory at least, were to pay the trustee(s) of the nominee realty trust sums sufficient to satisfy the mortgage obligations to the new lenders.

In most instances, the Debtor applied for mortgage loans to acquire the properties from the distressed homeowners and signed the HUD-1 Settlement Statements at the closings.[3] His law partner, Andrew Palmer, served as Settlement Agent for which he was compensated in the range of $650 to $1,050 or more per transaction.[4] Pursuant to the Interim Ownership Agreements, the property owners, who were identified as the sellers, were expected to pay all the closing costs, a fact that was not reflected on the HUD-1 Settlement Statements. In Sohmer's words, "they [the HUD-1s] did not portray the whole picture, certainly." Indeed, he agreed that the HUD-1s were inaccurate in material

---

[3] In a few instances, Bradley Sohmer or Jennifer Sohmer executed the HUD-1s.

[4] Andrew Palmer executed the HUD-1 Settlement Statements under the following statement: "The HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds disbursed or to be disbursed by the undersigned as part of the settlement of this transaction." The HUD-1s also contain the following statement:

> WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

respects.[5]  The HUD-1s omitted any reference to the $15,000 fee paid by the homeowners

to Timeless Funding, referenced monies paid to the homeowners that they did not receive,

and listed amounts paid by the Debtor or his nominees, which were not made.  In addition,

at least one of the Uniform Residential Loan Applications Sohmer prepared for the purpose

of acquiring property from Timeless Funding program participants John J. Bertelli and

Kathleen M. Bertelli was false as the Debtor listed ownership of real property which was,

in fact, held in trust, as well as ownership of the very property for which he sought

financing, namely 420 High Street, Bridgewater, Massachusetts.

In conjunction with the Interim Ownership Agreements, the homeowners typically

held a  85% beneficial interest in the nominee trust which eventually held title to the

---

[5] Section 1010 of title 18 provides criminal penalties for the following conduct:

Whoever, for the purpose of obtaining any loan or advance of credit from
any person, partnership, association, or corporation with the intent that
such loan or advance of credit shall be offered to or accepted by the
Department of Housing and Urban Development for insurance, or for the
purpose of obtaining any extension or renewal of any loan, advance of
credit, or mortgage insured by such Department, or the acceptance,
release, or substitution of any security on such a loan, advance of credit, or
for the purpose of influencing in any way the action of such Department,
makes, passes, utters, or publishes any statement, knowing the same to be
false, or alters, forges, or counterfeits any instrument, paper, or document,
or utters, publishes, or passes as true any instrument, paper, or document,
knowing it to have been altered, forged, or counterfeited, or willfully
overvalues any security, asset, or income, shall be fined under this title or
imprisoned not more than two years, or both.

18 U.S.C. 1010.

properties, and Timeless Funding held the remaining 15% interest.  Timeless Funding, however, was simply Sohmer's alter ego as it did not receive or disburse funds and did not have a separate bank account.

In practice, the Timeless Funding program failed to benefit either the property owners or the Debtor.  The financial difficulties plaguing the property owners were not alleviated by reduced monthly payments, and many defaulted with respect to their interim ownership contributions, triggering defaults by Sohmer to the lenders he borrowed from to acquire title from the Timeless Funding homeowners.  Sohmer attempted to keep up with his mortgage obligations but, in his words, the Timeless Funding program "got away" from him, resulting in a "nightmare of mortgages in potential foreclosures."

In the late summer of 2006, the Commonwealth commenced a civil action against Sohmer and his spouse, both individually and as trustees of various nominee trusts, and Timeless Funding in the Suffolk Superior Court, Department of the Trial Court and obtained a Temporary Restraining Order on August 30, 2006.  That order prohibited the Sohmers, in their individual capacities and as trustees, and Timeless Funding, its agents, employees, and affiliates, from "transferring, pledging, selling, mortgaging, encumbering, or in any way disposing of ownership or custody of any real or personal assets that Defendants own or control . . . ."  In violation of that injunction, the Debtor and his spouse refinanced their property located at 23 Roxanne Road, Pembroke, Massachusetts in mid-September 2006.  The Debtor did not disclose the transaction in his Statement of Financial Affairs.

8

In addition to the civil action commenced against him by the Commonwealth, several Timeless Funding participants became disenchanted with the program and commenced actions against him. These actions caused Sohmer, in an e-mail sent on August 14, 2006, to advise his partner, Andrew Palmer, of the following: "I have removed all of my files from the office. I do not think it is a good idea that I am seen renting space. A little distance wouldn't hurt."

At the commencement of his case, in addition to his marital residence and office condominium, the Debtor held title to 22 properties, either as trustee or as co-trustee with his brother, Bradley Sohmer, or his spouse, Jennifer Sohmer. He held title to one property, 3 Lady Allison Way, Bourne, Massachusetts, as trustee of the Sohmer Family Intervivos Trust. The owners of the property located at 5 Joe Jay Lane, Sandwich, Massachusetts conveyed it to Jennifer Sohmer by quitclaim deed, and the property may have been subsequently transferred to a nominee trust, although the declaration of trust was not introduced into evidence. Although holding title to 49 Courtland Street, Middleboro, Massachusetts as Trustee of the 49 Courtland Street Nominee Trust, the Debtor, through the merger of legal and equitable title, actually owned that property outright as he was designated the 100% beneficiary of the trust. The Debtor testified that the schedule of beneficiaries of that nominee trust was erroneous.

C. Timeless Funding's Books and Records

Although the Debtor prepared "Accounting Statements" for each of the Timeless Funding program participants, the statements were not necessarily contemporaneous with

receipts and disbursements and contained no references to any of the five bank accounts the Debtor used to deposit and disburse monies.  In addition, the Debtor utilized an accounting software program identified as QuickBooks.  Jalbert testified that because the Debtor maintained the Timeless Funding accounting statements using a word processing program, and because the Debtor failed to reconcile his QuickBooks software program, it was impossible to verify the accuracy of the accounting statements without tracking each and every receipt and disbursement through the numerous bank accounts used by the Debtor to funnel Timeless Funding income and expenditures. The difficulty was compounded  because of the lack of evidentiary support for some of the entries and the Debtor's use of inconsistent terminology.

D. The Debtor's Bankruptcy Schedule A and Statement of Financial Affairs

The collapse of Timeless Funding triggered the Debtor's decision to commence a Chapter 11 on November 6, 2006.  Two weeks later, the Debtor elected to convert his Chapter 11 case to a case under Chapter 7 and Harold B. Murphy, Esq. was appointed the Chapter 7 Trustee.  The Trustee engaged the accounting firm of Verdolino & Lowey, P.C., whose principal, Jalbert, together with representatives of the Trustee, secured the Debtor's law office soon after the Trustee's appointment.  As noted above, the Debtor filed his Schedules and Statement of Financial Affairs on December 22, 2006, signing them under penalty of perjury.

On Schedule A-Real Property, the Debtor listed his marital residence, business condominium, a month-to-month lease, as well as 22 other properties associated with the

Timeless Funding program.  He specified the nature of his interest in the property as follows: "Timeless Funding holds a 15% beneficial interest in the property." A comparison of the Plaintiffs' exhibit setting forth properties held in trust (with the exceptions of the property located at 5 Joe Jay Lane, Forestdale, Massachusetts, for which no deed from Jennifer Sohmer to a nominee trust was produced, and the property located at 49 Courtland Street, Middleboro, Massachusetts, which the Debtor owned outright as a result of the merger of the legal and equitable title), the Debtor's ownership interests with respect to the Timeless Funding properties were equitable interests in nominee trusts and did not constitute an ownership interest in the real estate itself.  The Debtor did not list his equitable interests in the nominee trusts on Schedule B-Personal Property (Question 19. "Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule A-Real Property" and Question 35. "Other personal property of any kind not already listed.").  He did not disclose the transfers arising from the Timeless Funding participants' conveyances of their properties to him (or his nominees) and then by him (or his nominees) to the nominee trusts holding title to the properties in his Statement of Financial Affairs.[6]  Additionally, he did not disclose the acquisition of mortgage financing to acquire the properties from Timeless Funding participants and the existence and amount of funds held in trust for the benefit of the

---

[6] *See* Question 10a. "List all property. . . transferred either absolutely or as security within two years immediately preceding the commencement of this case. . . . and Question 10b. " List all property transferred by the debtor within ten years immediately preceding the commencement of the case to a self-settled trust or similar device of which the debtor is a beneficiary."

Timeless Funding participants in his Statement of Financial Affairs.[7]

    E. <u>The Debtor's Personal Injury Practice, Schedule B and the Statement of Financial Affairs</u>

    1. Schedule B

On Schedule B-Personal Property, the Debtor listed, among other things, 10 bank accounts (four at Citizens Bank and six at Community Bank),[8] and $66,624.30 in "money owed by Timeless Funding participants . . . ."  At his section 341 meeting, which was held on January 17, 2007, the Debtor was specifically asked whether, in addition to those listed on Schedule B,  he owned, controlled, utilized or had check signing authority with respect to any other financial accounts from January 4, 2004 to the present.  He responded as follows: "No."  The question was repeated, and he answered as follows:  "Oh, no, there

---

[7] *See* Question 14. "Property held for another person. List all property owned by another person that the debtor holds or controls."

[8] The Debtor listed the following bank accounts:

Citizens Bank Business Account No.  xxx 235-1
Citizens Bank Personal Checking Account No. xxx 333-7
Citizens Bank IOLTA Account xxx 8874
Community Bank IOLTA Account No. xxx 0905
Community Bank Business Account No. xxx 1781
Community Bank Trust Account No. xxx 3816
Community Bank Power of Attorney Account No. xxx 1476
Citizens Bank IOLTA Account No. xxx 272-6
Community Bank IOLTA Account No. xxx 0905 (The Debtor appears to have listed this account twice.  The first time, he indicated that is current value was unknown.  The second time, he listed it with a value of $415.51.)
Community Bank DIP Account No. xxx 3703 (This account did not exist prepetition.  In the parties' Joint Pre-Trial Memorandum, the Debtor stipulated that the account was opened on November 9, 2006.)

were no other accounts, I believe, that I've ever had, other than certainly those that are referenced." Those statements were made under oath and false.

2. The Sovereign Bank accounts

In addition to the accounts listed on Schedule B, the Debtor had other bank accounts, including two at Sovereign Bank, one ending in the digits 8972, and the other ending in the digits 7016. He opened the accounts on November 4, 2006, two days before he filed his Chapter 11 petition. The Debtor suggested during his testimony that he intended those accounts to be Debtor in Possession accounts, although they were not designated as such on any of the bank statements. On November 6, 2006, he deposited the sum of $85,796.74 into Sovereign Bank Account xxx 7016 using a Citizens Bank treasurer's check; two days later, again using a Citizens Bank treasurer's check, he deposited another $10,000 into Sovereign Bank Account xxx 7016. On November 9, 2006, the Debtor opened a Community Bank Account xxx 3703 and the next day, November 10, 2006, he deposited $92,705.57 into that account. On December 11, 2006, he withdrew the remaining funds in the Sovereign Bank Account  xxx 7016, which totaled $3,092.44.

In sum, the Debtor stipulated 1) that on October 12, 2006, he deposited refinancing proceeds from his personal residence in the sum of $157,283.81 into his Citizens Bank Account No. xxx 333-7; 2) that on October 18, 2006, he withdrew $130,000 from Citizens Bank Account No. xxx 333-7 in the form of a treasurer's check; 3) that on October 24, 2006, using a Citizens Bank treasurer's check dated October 18, 2006, he deposited $130,000 back into Citizens Account No. xxx 333-7; 4) that on November 4, 2006, he withdrew $95,796.97

13

from Citizens Bank Account No. xxx 333-7; and 5) that on November 6, 2006, he deposited

$85,796.97 into Sovereign Account No. xxx 7016 using a Citizens Bank treasurer's check

dated November 4, 2006.   Thus, according to the Debtor, the initial deposit into the

undisclosed Sovereign Account No. xxx 7016 constituted proceeds from the refinancing of

his marital residence, which transaction violated the Superior Court's restraining order,

and was not disclosed on the Statement of Financial Affairs.   On November 10, 2006, the

Debtor withdrew $92,705.57 from Sovereign Account xxx 7016 and deposited the money

into Community Bank Account No. xxx 3703.

The Debtor also did not disclose Sovereign Bank Account No. xxx 8972, which he

opened on November 4, 2006. He made his first deposit into that account on the petition

date in the amount of $4,039.91.   Neither account contained any reference to "Debtor in

Possession" or "DIP."

       3.   The Debtor's prepetition personal injury clients and postpetition
       settlements

As noted above, the Debtor's law practice was not limited to consumer bankruptcy

cases.   Prior to his bankruptcy, the Debtor entered into oral and written contingency fee

agreements with a number of clients to represent them in connection with personal injury

claims before he filed his bankruptcy petition.[9]   The Debtor did not keep time records for

---

[9] *See* Rule 1.5(c) of the Massachusetts Rules of Professional Conduct which
provides in pertinent part the following: "Except for contingent fee arrangements
concerning the collection of commercial accounts and of insurance company
subrogation claims, a contingent fee agreement shall be in writing and signed in
duplicate by both the lawyer and the client within a reasonable time after the making of
the agreement. . . ."

the work performed for his personal injury clients and customarily took one-third of any recovery plus costs.[10]   Whether oral or written, the contingency fee agreements were contracts, which the Debtor had the ability to enforce, although on Schedule I-Current Income of Individual Debtor(s), the Debtor stated: "Debtor will close down his law practice and will likely see a decrease in income over the next 6-12 months.  Timeless Funding has ceased doing business."

After filing his bankruptcy petition, but before the section 341 meeting held January 17, 2007 at which he testified under oath, the Debtor, on January 8, 2007, opened an IOLTA bank account at Rockland Trust (Account No. xxx 2905).  He subsequently deposited 21 checks into that account related to the settlement of personal injury claims of clients with whom he had contingency fee agreements prior to the commencement of his case.  The

---

[10] The Plaintiffs introduced into evidence copies of three identical Contingent Fee Agreements, permitting the inference that the Debtor used the same standardized form for most if not all his personal injury clients.  The Agreements provided in pertinent part the following:

> In the case of a negotiated settlement, reasonable compensation on the foregoing contingency is to be paid by the Client to the Attorney, such compensation (including that of any associated counsel) shall equal to 33 and $1/3^{rd}$ percent of the gross amount collected.  In the event that litigation is required, the Client shall pay to the Attorney an additional five (5) percent, over the above-mentioned 33 and $1/3^{rd}$ percent.  In the event of any appeal or second trial, the Client shall pay to the Attorney an additional five (5) percent, over the above-mentioned litigation 38 and $1/3^{rd}$ percent.

> In the event that the Attorney is discharged prior to the conclusion of this claim, Attorney shall be entitled to a one-third contingent fee of the final settled or adjudicated award.

15

Debtor did not disclose these contingency fee agreements as assets either on Schedule B, Schedule G-Executory Contracts, or in his Statement of Financial Affairs.  The following is a list of clients, the date of the settlement check received by Sohmer, and the amount of the settlement check:

| Prepetition Client | Date of Settlement Check | Amt. of Settlement Check |
|---|---|---|
| Anthony Cahill | 12/19/06 | $3,000 |
| Helen Soderlund | 12/26/06 | $42,500 |
| Michelle Brousseau | 1/17/07 | $5,000 |
| Kimberly May | 1/19/07 | $7,279.41 |
| Marie Cherie | 3/16/07 | $5,000 |
| Casseus Cadeus | 4/12/07 | $3,000 |
| Marie Cherie | 4/12/07 | $3,000 |
| Melinda Cherie | 4/18/07 | $3,000 |
| Natalie Cherie | 4/18/07 | $2,000 |
| Joanne Bergin | 5/7/07 | $27,500 |
| Wesley Designor | 6/4/07 | $7,500 |
| Debra Hutchinson | 6/5/07 | $17,500 |
| James White | 10/3/07 | $4,500 |
| John Doe | 10/25/07 | $200,000 |
| Shamus Scannell | 4/4/08 | $7,500 |
| Cindy Soderlund | 4/10/08 | $9,000 |
| Vernae Barber | 4/30/08 | $7,500 |
| Jean Fleurime | 4/22/08 | $6,000 |
| Marie Aneus | 4/22/08 | $4,000 |
| Amber Sampson | 6/26/08 | $110,000 |

| Robert Levine | 10/14/08 | $4,413.04 |
|---|---|---|
| **Total** | | **$479,192.45** |

At trial, the Plaintiffs were able to establish links between the total settlement amounts received by the Debtor from certain of his personal injury cases, which were initially deposited into his Rockland Trust IOLTA account, with the net amounts of money attributable to Sohmer's contingent fee. Sohmer subsequently deposited those amounts into his Sovereign Bank Account No. xxx 8972 using Rockland Trust treasurer's checks as follows:

| Date of Deposit | Amt. of Deposit | Type of Deposit | Client |
|---|---|---|---|
| 7/13/07 | $5,856.64 | Rockland Trust treasurer's check | Debra Hutchinson |
| 7/13/07 | $2,525.88 | Rockland Trust treasurer's check | Wesley Designor |
| 5/16/2008 | $2,526.46 | Rockland Trust treasurer's check | Shamus Scannell |
| 5/16/08 | $2,500 | Rockland Trust treasurer's check | Vernae Barber |
| 5/16/08 | $3054.14 | Rockland Trust treasurer's check | Cindy Soderlund |
| 5/16/08 | $3,333.33 | Rockland Trust treasurer's check | Jean Fleurime and Marie Aneus |
| **Total** | **$19,796.45** | | |

The Debtor also deposited checks into Sovereign Account xxx 8972 which he received and which were dated before November 6, 2006, the date of the filing of his petition, including a Citizens Bank check in the sum of $4,039.91 which he used to open the

account, as well as nine other checks totaling $14,937.  All of these checks were from

prepetition clients and some related to the filing of bankruptcy petitions (two checks were

in the sum of $299 - - the amount of the filing fee for a Chapter 13 case).  Neither the

Debtor's Schedules nor Statement of Financial Affairs contained any references to those

payments.

On November 30, 2006, the Debtor sent an e-mail to his attorney, containing an

unsworn "current Case Inventory." In that e-mail, he stated:

> Attached (MS Word format) please find my current Case Inventory. I have
> estimated the value, where applicable.
>
> Please note, I have no outstanding fees owed.  All cases that were fee based
> were collected and deposited prior to the commencement of the case.  I
> believe that his represents my entire case load.

The Debtor added that he required access to his laptop computer to handle his pending

bankruptcy cases.

The Debtor's current Case Inventory contained the names of 26 clients with

contingency fee agreements and 17 consumer bankruptcy clients.   The Debtor did not

ascribe a value to most of the contingency fee cases listed.  The highest value ascribed to

any case was $10,000.  The Debtor did not include in his Case Inventory the names of the

two clients whose postpetition settlements yielded the largest fees, namely "John Doe" and

Helen Soderlund, as well as the names of five other clients for whom he obtained

postpetition settlements.  In particular, the Debtor received a settlement check in the

amount of $42,500, dated December 26, 2006, for Helen Soderlund just after he filed his

18

Schedules and Statement of Financial Affairs.   Additionally, the Roman Catholic
Archbishop of Boston issued a check made payable to Alec G. Sohmer & Associates as
Attorney for John Doe, a minor whose identity is confidential, on October 25, 2007 in the
sum of $200,000.  The Debtor deposited that check in his Rockland Trust Account xxx 2905,
and obtained a Rockland Trust Treasurer's Check dated November 5, 2007 in the sum of
$128,158.34.

4.  The Debtor's Other Bank Accounts and Investment Accounts

The Debtor stipulated that he did not disclose an active Citizens Bank Account xxx
2378 in his Schedules or Statement of Financial Affairs.  Additionally, he did not disclose
the following four accounts at Community Bank:

Account No. xxx 4751, Alec G. Sohmer, Power of Attorney for Arlene S.
Isaacson
Account No. xxx 0319 Alec G. Sohmer, IOLTA Account
Account No. xxx 9885 Alec G. Sohmer, Trustee for Jennifer J. Sohmer
Account No. xxx 8453 Alec G. Sohmer, ITF Jennifer J.  Sohmer

The last two accounts were closed on March 23, 2006, within one year of the filing of his
petition.

Although the Debtor listed five John Hancock SEP/ IRA accounts on Schedule B, he
admitted in the Joint Pre-Trial Stipulation that he omitted three other accounts  as follows:

Account No. xxx 921-0 SEP/ IRA
Account No. xxx 6728 Life Insurance Policy for Anthony R. and Diane L.
Shaw[11]
Account No. xxx 139-3 Beneficiary of Rollover IRA of Jennifer J. Sohmer

_____

[11] The Debtor was identified as the Trustee of the Shaw Family Life Insurance
Trust, which was created in April of 2000.

19

The Debtor's SEP/ IRA had a share balance of 875.8070, and he was the beneficiary of his wife's Rollover IRA account.

F. The Debtor's Books, Records and Tax Returns

1. Timeless Funding records

Jalbert testified that his firm was engaged to analyze the Debtor's books, records, and accounts. Together with counsel to the Trustee, he visited the Debtor's Brockton office where he found the Debtor's office, a conference room, and a room on the second floor to be in complete disarray with papers everywhere, including opened and unopened mail. He indicated that the initial focus of his efforts was to obtain the Debtor's bank records and understand the Timeless Funding activity in those records. While he stated his belief that the Debtor made an effort to account for the Timeless Funding transactions and that his records were "generally accurate," the Debtor's use of five bank accounts in which he commingled personal, law office, and Timeless Funding receipts and disbursements, the lack of support for some itemizations, inaccurate dates for various transactions, and inconsistent terminology for recording information presented problems. The disorganized records prevented him from reconciling the accounting statements prepared for the Timeless Funding participants and the Debtor's QuickBooks accounting software program, particularly as the Debtor never reconciled his bank accounts on QuickBooks.

Jalbert indicated that, although he collected the Debtor's books and records, he was available by appointment to meet with the Debtor to enable him to access his records, including client files, and to prepare his Schedules and Statement of Financial Affairs.

Jalbert reported that as of September 11, 2009, his firm had incurred fees in excess of

$47,515 and expenses of $611.98 in trying to make sense of the Debtor's accounts,

QuickBooks and Timeless Funding transactions. Additionally, Jalbert testified that his firm

performed a significant amount of work for which it did not charge the bankruptcy estate.

Indeed, he testified that the firm spent "north of 400 hours" attempting to reconcile the

Debtors' various accounts and ascertaining his business affairs.

2. The Debtor's Tax Returns

The Plaintiffs introduced into evidence the joint federal and state income tax returns

submitted by the Debtor and his spouse for 2004 and 2005. The Debtor and his spouse

signed the returns under penalty of perjury. On Schedule C to the tax return, the Debtor

reported gross receipts of $729,671 and a net profit of $116,778 for the 2004 tax year; the

Debtor reported gross receipts of $1,002,986 and a net profit of $95,381 for the 2005 tax year.

He did not reference Timeless Funding on either return. Nevertheless, on his Statement

of Financial Affairs, the Debtor attributed both his 2004 and 2005 net income to his law

practice **and** Timeless Funding activities, although the first Timeless Funding transaction

did not close until January 5, 2005.[12] Additionally, on his Statement of Financial Affairs,

Sohmer reported his net income rather than his gross income for those years. Because

Sohmer generally took a $15,000 fee from Timeless Funding participants, and there were

17 Timeless Funding transactions in 2005, the Debtor would have been expected to report

---

[12] Exhibit 40 contains deeds from Timeless Funding participants to the Debtor or
his nominee. The first deed from Linda M. Harrison to Alec G. Sohmer is dated January
5, 2005.

approximately $255,000 in gross income from Timeless Funding in 2005, as well as "rental contributions" made by Timeless Funding participants whose homes were in nominee trusts. The Debtor, however, commingled the income from his law practice and from Timeless Funding on his tax returns as well as in his bank accounts, despite the separate line item on IRS Form 1040 requiring disclosure and the filing of Schedule E for "Rental real estate, royalties, partnerships, S corporations, trusts, etc."

Additionally on Schedule C attached to his federal income tax return, the Debtor reported "Client Loans" in the amount of $19,579 in 2005. On Schedule B, he listed 10 Timeless Funding participants and accounts receivable due from them totaling $66,624.30. There was no satisfactory explanation for the difference.

G. The Testimony of the Estate's Professionals

The Debtor emphasized the circumstance that he was locked out of his office and lacked access to his laptop computer when he converted his case from Chapter 11 to a case under Chapter 7. Nevertheless, ten days after the date of the conversion of his case to Chapter 7, and before filing his Schedules on December 22, 2006, he produced a Case Inventory. Although Jalbert and counsel to the Trustee collected his books and records on the day they secured his office, and Jalbert did not communicate with him about his accounting practices, the Debtor did not testify that either Jalbert or the Trustee refused him reasonable access to client files, books, records, and other papers or that he even requested that they do so. While it may not have been as convenient for him to compile information as it would have been had he remained a Chapter 11 debtor in possession, the

22

Court finds that he was not deprived of access to his business and personal records so as to justify the submission of false and inaccurate Schedules and a false and inaccurate Statement of Financial Affairs.

The Trustee testified about his experience liquidating law practices. He noted that the attorney - client privilege and the collection of contingent fees owed attorneys poses challenges to trustees charged with oversight of attorneys and law firms who are debtors. He testified that it was his practice to enter into arrangements whereby the estate and the attorneys working on contingency fee cases would share any recoveries based upon an allocation of prepetition and postpetition services, adding that he relied upon self-reporting by the attorneys involved.

The Trustee testified that he reviewed the Case Inventory produced by the Debtor, but did not enter into an agreement with the Debtor with respect to his contingency fee cases, focusing instead on the more urgent and complex Timeless Funding issues. The Trustee concluded based upon his review of the Case Inventory that "it didn't appear that there was any meaningful value there." The Trustee indicated, however, that the Debtor did not inform him of, and he was unaware of, the $42,500 settlement obtained for Helen Soderlund, the $200,000 settlement received on behalf of John Doe, the $27,500 settlement received on behalf of Joanne Bergin,[13] the $17,500 settlement received on behalf of Debra

---

[13] In his Case Inventory, the Debtor described the value of her claim as "Strong liability/weak damages. Unknown value due to damages."

Hutchinson,[14] and the $110,000 settlement received on behalf of Amber Sampson.[15] According to the Trustee, the Debtor's rights to or interests in the contingency fees should have been disclosed in his Schedules. The Trustee stated that he relied upon the Debtor's Schedules, as well as his statement on Schedule I that he was relinquishing the practice of law.

The Trustee concluded his direct testimony with the observation that a significant portion of the time he committed to the Debtor's case was focused on obtaining relief for the Timeless Funding participants. He stated:

> We put together at least a fix of restoring ownership of the homes to the original homeowners, and working on arrangements so that lenders - - the lenders that financed Mr. Sohmer's acquisition would afford the original homeowners an opportunity to keep their homes, and by which they wrote down their mortgages - - the amount equal to the lesser of the value of the prop - -some percentage of the value of the property, of what was paid out to their existing mortgages. That was a very complicated settlement.

The Trustee testified that after the conversion of the case to Chapter 7, the Debtor's office was locked and that the Debtor did not have unfettered access to his office without the presence and supervision of his representatives. Additionally, he testified that he had no discussions with the Debtor about the value of the cases listed in the Case Inventory or about the potential sale of the personal injury cases to him, adding that he did not abandon

---

[14] In his Case Inventory, the Debtor described the value of her claim as "High damages/poor liability. Unknown value."

[15] In his Case Inventory, the Debtor described the value of her claim as "Valuable only if able to settle by lump sum. Due to her age and employment history, lump sum value is low. May receive statutory fee at hearing level."

24

the cases.  According to the Trustee, the value of the Debtor's contingency fee cases would

vary depending upon whether most of the work was done prepetition.  He explained:

> I think the estate would have a very small claim if any of the *quantum meruit*
> basis, if all the work was done post-petition or minimal work was done post-
> petition.  Obviously it wouldn't be fair necessarily for the estate to get a huge
> percentage of any recovery.  If, on the other hand, a case settles shortly after
> the filing, the work that was all done pre-filing, the estate should get most if
> not all, of the contingency fee.

## III. DISCUSSION

A. <u>The Statute</u>

The Plaintiffs seek to deny the Debtor a discharge under 11 U.S.C. § 727(a), which

provides in relevant part the following:

> (a) The court shall grant the debtor a discharge, unless--
>
>> (2)  the debtor, with intent to hinder, delay, or defraud a
>> creditor or an officer of the estate charged with custody of
>> property under this title, has transferred, removed, destroyed,
>> mutilated, or concealed, or has permitted to be transferred,
>> removed, destroyed, mutilated, or concealed--
>>
>>> (A)  property of the debtor, within one year
>>> before the date of the filing of the petition; or
>>>
>>> (B)  property of the estate, after the date of the
>>> filing of the petition;
>>
>> (3)  the debtor has concealed, destroyed, mutilated, falsified, or
>> failed to keep or preserve any recorded information, including
>> books, documents, records, and papers, from which the
>> debtor's financial condition or business transactions might be
>> ascertained, unless such act or failure to act was justified under
>> all of the circumstances of the case;

25

(4) the debtor knowingly and fraudulently, in or in connection with the case--

> (A) made a false oath or account;

> (B) presented or used a false claim;

> (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

> (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . . .

11 U.S.C. § 727(a).

B.  Applicable law under 11 U.S.C. § 727(a)(4)(A) and (D)

The United States Court of Appeals for the First Circuit has addressed the legal standards applicable to what this Court considers the crux of the Plaintiffs' Second Amended Complaint, namely the Debtor's knowing and fraudulent false oaths made in conjunction with his Schedules and Statement of Financial Affairs.  *See* 11 U.S.C. § 727(a)(4)(A).  From the submission of those false documents and circumstantial evidence, the Court can infer violations of other subsections of 11 U.S.C. § 727, namely subsections (a)(2) and (a)(4)(D).

26

In <u>Boroff v. Tully (In re Tully)</u>, 818 F.2d 106 (1st Cir. 1987), the First Circuit stated:

> Under § 727(a)(4)(A), the debtor can be refused his discharge only if he (i) knowingly and fraudulently made a false oath, (ii) relating to a material fact. The burden of proof rests with the trustee, <u>In re Shebel</u>, 54 B.R. 199, 202 (Bankr. D. Vt. 1985), but "once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." <u>Matter of Mascolo</u>, 505 F.2d 274, 276 (1st Cir.1974).
>
> The statute, by its very nature, invokes competing considerations. On the one hand, bankruptcy is an essentially equitable remedy. As the Court has said, it is an "overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." <u>Bank of Marin v. England</u>, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). In that vein, the statutory right to a discharge should ordinarily be construed liberally in favor of the debtor. <u>Matter of Vickers</u>, 577 F.2d 683, 687 (10th Cir.1978); <u>In re Leichter</u>, 197 F.2d 955, 959 (3d Cir.1952), *cert. denied*, 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953); <u>Roberts v. W.P. Ford & Son, Inc.</u>, 169 F.2d 151, 152 (4th Cir.1948). "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." <u>Dilworth v. Boothe</u>, 69 F.2d 621, 624 (5th Cir.1934).
>
> On the other hand, the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. *The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction.* As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." <u>Mascolo</u>, 505 F.2d at 278. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight. *See* <u>In re Tabibian</u>, 289 F.2d 793, 797 (2d Cir.1961); <u>In re Shebel</u>, 54 B.R. at 202. The bankruptcy judge must be deft and evenhanded in calibrating these scales.

<u>In re Tully</u>, 106 F.3d at 110 (emphasis supplied).  *See also* <u>The Cadle Co. v. Duncan (In re</u>

<u>Duncan)</u>, 562 F.3d 688, 696 (5th Cir. 2009) (citing <u>Tully</u> and shifting the burden to the debtor

to present evidence that he is innocent of the offense charged if the plaintiff establishes a

prima facie case.). In <u>Duncan</u>, the Fifth Circuit fashioned a five part test in contrast to the

First Circuit's two part test.  It stated:

> Section 727(a)(4) conditions the debtor's discharge on his truthfulness: "The
> court shall grant the debtor a discharge, unless . . . the debtor knowingly and
> fraudulently, in or in connection with the case . . . made a false oath or
> account."  To prevail on a claim under this subsection, an objecting plaintiff
> (a creditor or the trustee) must prove by a preponderance of the evidence
> "that (1) the debtor made a . . . statement under oath; (2) the statement was
> false; (3) the debtor knew the statement was false; (4) the debtor made the
> statement with fraudulent intent; and (5) the statement was material to the
> bankruptcy case." <u>Sholdra v. Chilmark Fin. LLP ( In re Sholdra)</u>, 249 F.3d 380,
> 382 (5th Cir.2001) (citing <u>Beaubouef v. Beaubouef ( In re Beaubouef)</u>, 966 F.2d
> 174, 178 (5th Cir.1992)).  Circumstantial evidence may be used to prove
> fraudulent intent, *id.*, and the cumulative effect of false statements may,
> when taken together, evidence a reckless disregard for the truth sufficient to
> support a finding of fraudulent intent, *see id.* at 383.

> False statements in the debtor's schedules or false statements by the debtor
> during the proceedings are sufficient to justify denial of discharge.
> <u>Beaubouef</u>, 966 F.2d at 178. Further, the materiality of an omission is not
> solely based on the value of the item omitted or whether it was detrimental
> to creditors. <u>Id</u>. Rather, the statement need only "bear [ ] a relationship to the
> bankrupt's business transactions or estate, or concern[ ] the discovery of
> assets, business dealings, or the existence and disposition of his property."
> <u>Id</u>. (quoting <u>Chalik v. Moorefield ( In re Chalik)</u>, 748 F.2d 616, 617 (11th
> Cir.1984)).  Indeed,

>> [t]he recalcitrant debtor may not escape a section 727(a)(4)(A)
>> denial of discharge by asserting that the admittedly omitted or
>> falsely stated information concerned a worthless business
>> relationship or holding; such a defense is specious. It makes no
>> difference that he does not intend to injure his creditors when
>> he makes a false statement. Creditors are entitled to judge for
>> themselves what will benefit, and what will prejudice, them.

> <u>Id</u>. (quoting <u>Chalik</u>, 748 F.2d at 618).

28

With respect to 11 U.S.C. § 727(a)(4)(D), a party objecting to discharge under that section has the initial burden of proving the following: "1) the withholding of documents was done by the debtor or someone for whose conduct the debtor is legally responsible; 2) was in connection with a case; 3) was withheld from an officer of the estate entitled to possession; 4) was done knowingly and fraudulently; and 5) relates to the debtor's property or financial affairs." Olson v. Slocombe (In re Slocombe), 344 B.R. 529, 534 (Bankr. W.D. Mich. 2006). *See also* Lassman v. Hegarty (In re Hegarty), 400 B.R. 332, 344 n. 81 (Bankr. D. Mass. 2008).

C. Analysis of the Plaintiffs' Claims under 11 U.S.C. § 727(a)(4)(A), (a)(4)(D)

The Court finds that the Plaintiffs sustained their burden of establishing that the Debtor knowingly and fraudulently made false oaths both on his Schedules and Statement of Financial Affairs and at his section 341 meeting and that those false statements were material and intended to mislead the Trustee and creditors. Regardless of whether a three-part or five-part test is employed, circumstantial evidence supports findings that the Debtor knew his statements to be false and that he made them with fraudulent intent. At the very least, the number and extent of the Debtor's errors and omissions in his Schedules and Statement of Financial Affairs, together with his conduct in acceding to the use of false and misleading HUD-1 Settlement Statements, his conduct in submitting a false Uniform Residential Loan Application, his conduct in violating a restraining order obtained by the Commonwealth of Massachusetts, his conduct in improperly using IOLTA accounts, and his conduct in opening and using the Rockland Trust account for hide and shelter

29

prepetition property of the estate, demonstrate his reckless disregard for truth and
fraudulent intent. The Court discredits the Debtor's contention that he lacked fraudulent
intent due to the nature and extent of the inaccuracies and omissions in his Schedules and
Statement of Financial Affairs.

The Debtor omitted from his Schedules three bank accounts in his own name or that
of his law office (Sovereign Bank Account Nos. xxx 8972 and 7016 and Community Bank
Account No. xxx 0319), as well as three other Community Bank accounts. Additionally, on
Schedule B, he omitted his SEP/IRA Account No. xxx 921-0 at John Hancock, which
contained a share balance of 875.8070, as well as two other accounts, one of which
belonged to his spouse who had designated him the beneficiary of her account.

The Debtor's omissions of the Sovereign Bank accounts were particularly egregious
as he had opened the accounts just two days before he filed his Chapter 11 petition and
deposited funds in them on the very day he filed his petition. He compounded his
omissions by lying about the existence of the Sovereign Bank accounts at his section 341
meeting. Furthermore, he used Sovereign Bank Account No. xxx 8972 to deposit at least
some of the contingency fees he received postpetition from settlements of prepetition
personal injury cases, totaling $19,796.45, and he used the same account to make
postpetition deposits of checks, totaling $18,978.91, which he received prepetition. The
Court rejects the Debtor's suggestion that the Sovereign Bank accounts were intended to
be Debtor in Possession accounts.

In addition to failing to disclose his Sovereign Bank accounts, the Debtor failed to

disclose, either in his Schedules or Statement of Financial Affairs, the contingency fee agreements he had with his personal injury clients, and, as noted above, the existence of prepetition checks he was holding at the commencement of his case.  While representing that he was discontinuing the practice of law on Schedule I, he failed to disclose to the Trustee the settlements of his prepetition  personal injury cases for which he obtained $479,192.45.

With respect to the Debtor's contingent fee agreements, the United States Court of Appeals for the Seventh Circuit considered the issue of "whether a merely potential contingent fee is property."  <u>In re Carlson</u>, 263 F.3d 748 (7th Cir. 2001).  It observed:

> The Bankruptcy Code requires the debtor to list as assets of the estate in bankruptcy "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). The term "legal or equitable interests ... in property" has been broadly interpreted to include any legally enforceable right, <u>United States v. Whiting Pools, Inc.</u>, 462 U.S. 198, 204-05, 209, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); <u>Cable v. Ivy Tech State College</u>, 200 F.3d 467, 472-73 (7th Cir.1999); <u>In re Jones</u>, 768 F.2d 923, 926 (7th Cir.1985); <u>In re Parsons</u>, 262 B.R. 475, 480 (8th Cir.BAP2001), except (so far as bears on this case), as the statute goes on to state, "earnings from services performed by an individual debtor after the commencement" of the bankruptcy proceeding. 11 U.S.C. § 541(a)(6). That a lawyer has a legally enforceable interest in a potential contingent fee is shown by the fact that if the client terminates his employment before judgment or settlement (for reasons other than wrongful conduct by the lawyer) and so before the lawyer receives any fee, he is entitled to the fair value of the services that he performed up to the termination. <u>Estate of Callahan</u>, 144 Ill.2d 32, 161 Ill.Dec. 339, 578 N.E.2d 985, 988 (Ill.1991); <u>Storm & Associates, Ltd. v. Cuculich</u>, 298 Ill.App.3d 1040, 233 Ill.Dec. 101, 700 N.E.2d 202, 208 (Ill.App.1998); <u>Kenseth v. Commissioner</u>, 259 F.3d 881, 882 (7th Cir.2001); <u>Maksym v. Loesch</u>, 937 F.2d 1237, 1245 (7th Cir.1991); <u>Skeens v. Miller</u>, 331 Md. 331, 628 A.2d 185, 188 (Md.1993); <u>Tillman v. Komar</u>, 259 N.Y. 133, 181 N.E. 75 (N.Y.1932). This is true even if he withdraws rather than being terminated, provided the withdrawal is for good cause. <u>Kannewurf v. Johns</u>, 260 Ill.App.3d 66, 198 Ill.Dec. 381, 632

N.E.2d 711, 716 (Ill.App.1994); <u>Leoris & Cohen, P.C. v. McNiece</u>, 226
Ill.App.3d 591, 168 Ill.Dec. 660, 589 N.E.2d 1060, 1064-65 (Ill.App.1992); <u>Reed
Yates Farms, Inc. v. Yates</u>, 172 Ill.App.3d 519, 122 Ill.Dec. 576, 526 N.E.2d
1115, 1124-25 (Ill.App.1988); <u>International Materials Corp. v. Sun Corp.</u>, 824
S.W.2d 890, 894 (Mo.1992). It follows that the fair value of the services
rendered by a contingent-fee lawyer up to the date of his bankruptcy (though
not after, by virtue of section 541(a)(6)) is property of his estate in
bankruptcy. <u>In re Jess</u>, 169 F.3d 1204, 1207 (9th Cir.1999); <u>Turner v. Avery</u>,
947 F.2d 772, 774 (5th Cir.1991).

But because the property interests that bankruptcy enforces are property
interests created by state law, <u>Barnhill v. Johnson</u>, 503 U.S. 393, 398, 112 S.Ct.
1386, 118 L.Ed.2d 39 (1992); <u>Butner v. United States</u>, 440 U.S. 48, 55, 99 S.Ct.
914, 59 L.Ed.2d 136 (1979); <u>In re Krueger</u>, 192 F.3d 733, 737 (7th Cir.1999), we
must consider whether, as Carlson argues, the decision of the Supreme Court
of Illinois in <u>In re Marriage of Zells</u>, *supra*, creates a different rule for Illinois
regarding the interest in a potential contingent fee. It does not.

<u>In re Carlson</u>, 263 F.3d at 750-51. Under Massachusetts law, just like under Illinois law, an

attorney has a legally enforceable interest in a potential contingent fee that is property of

the estate under 11 U.S.C. § 541(a). *See generally* <u>Malonis v. Harrington</u>, 442 Mass. 692

(2004). Accordingly, Sohmer was required to disclose his personal injury cases on his

Schedules, either on Schedule B or on Schedule G,[16] and his omission of his interests was

fraudulent.

The Debtor's Case Inventory did not cure his omissions. Not only did the Debtor

omit cases which resulted in the highest settlement amounts from his Case Inventory,

which was not filed with the Court or signed under oath, he minimized the value of the

cases on the list transmitted to the Trustee. Thus, the Court finds that Plaintiffs established

---

[16] The contingent fee interests could have been listed on Schedule B as "Other
contingent and unliquidated claims of every nature . . ." or as "Other personal property
of any kind not already listed" or on Schedule G as executory contracts.

that the Debtor withheld records relating to his property and financial affairs from the Trustee under 11 U.S.C. § 727(a)(4)(D).

In addition to the Debtor's omissions set forth above, the Debtor also failed to properly list his 100% ownership interest in 49 Courtland Street, Middleboro, Massachusetts on Schedule A, the existence of the nominee trusts, the amount of funds held in trust for the Timeless Funding participants,  and the Debtor's interests in those trusts either as a beneficiary or as the alter ego of Timeless Funding.

D. The Debtor's Defenses  under 11 U.S.C. § 727(a)(4)(A), (a)(4)(D)

The Debtor raises a no harm, no foul defense to Plaintiffs' claims with respect to the omission of the Sovereign Bank accounts and other assets.  He asserts that because there were no funds in the accounts at the time he filed his bankruptcy petition and because the Trustee learned of the accounts on the petition date, his failure to disclose the accounts was immaterial, although the evidence did not establish whether the initial deposits preceded or followed the actual time the Debtor filed his petition. The Court rejects the Debtor's position, particularly as he funded one of the accounts with the proceeds from the refinancing of his home, a transfer which he did not disclose on his Statement of Financial Affairs, and which was in violation of a temporary restraining order issued by the Suffolk Superior Court.

According to the court in United States Trustee v. Garland (In re Garland), 417 B.R. 805 (B.A.P. 10th Cir. 2009),

"The subject matter of a false oath is 'material,' and thus sufficient to bar

33

discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." Moreover, *materiality is not defeated by the fact that the undisclosed property interests are determined to be without value.* This is because "[b]ankruptcy is a serious matter and when one chooses to avail himself of the benefits of Chapter 7 relief he assumes certain responsibilities, the foremost being to fully disclose his assets and to cooperate fully with the trustee." As such, debtors have an "uncompromising duty to disclose whatever ownership interest [they hold] in property," and they must "disclose everything," rather than "make decisions about what they deem important enough for parties in interest to know."

417 B.R. at 814-15 (citations omitted, footnotes omitted)(emphasis supplied). *See also* In re

Mascolo, 505 F.2d 274, 277 (1st Cir. 1974)("Matters are material if pertinent to the discovery

of assets, including the history of a bankrupt's financial transactions").  Even assuming

there was no money in the accounts at the time the Debtor filed his petition and the

deposits were made minutes or hours after the commencement of his case, the Court finds

that the Debtor had a duty to disclose the *existence* of the accounts, particularly as he

immediately started to use Account No. xxx 8972 to deposit prepetition checks which,

depending upon whether they were payment in full or retainers for future work, should

have been listed on Schedule B as "Other personal property of any kind not already listed,"

or on the Statement of Financial Affairs.

The Debtor signaled his concern about his postpetition Chapter 11 income in his

Motion to Convert, but, nevertheless, misled the Trustee and creditors by stating "Debtor

will close down his law practice and will likely see a decrease in income. . . " on Schedule

I.   The Debtor's receipt of several prepetition checks in the amount of $299, the amount

of the filing fee for Chapter 13 cases, reveals that he intended to continue practicing

bankruptcy law, and his settlements of the personal injury cases he had prepetition belies his statement made under oath on Schedule I.

The Debtor proffered several excuses for his failure to disclose the existence of all his contingency fee entitlements and other assets, including lack of access to his office and lack of prejudice to the Trustee. The Court rejects the Debtor's excuses. In the first place, the Debtor had access to all his books, records and laptop computer between November 6, 2006 and the appointment of a Chapter 11 Trustee on November 15, 2006 at the earliest, or between November 6, 2006 and the allowance of his Motion to Convert on November 20, 2006 at the latest. In view of the initial November 22, 2006 deadline for filing his Schedules and Statement of Financial Affairs, the Debtor was or should have been in the process of compiling the information needed to honestly and accurately prepare his Schedules and Statement of Financial Affairs before the appointment of Harold Murphy as either Chapter 11 or Chapter 7 Trustee.

The Debtor argues that he lacked any fraudulent intent with respect to the omission of assets, again pointing to his limited access to his office and the Case Inventory, which the Trustee did not question him about. The Debtor, as an experienced bankruptcy practitioner, knew or should have known that completion of the Schedules and the Statement of Financial Affairs is one of the paramount duties of a debtor. *See* 11 U.S.C. § 521(a). Moreover, he knew or should have known that he could request a court order compelling the Trustee to grant him full and complete access to his records in order to complete his Schedules and Statement of Financial Affairs if the Trustee were unreasonably

denying him access to his office and business records.  He made no such request.  Finally,

the Debtor could have amended his Schedules and Statement of Financial Affairs at any

time if he perceived that they contained errors or omissions, *see* Fed. R. Bankr. P. 1009, yet

he failed to do so.

In <u>In re Tully</u>, the First Circuit observed:

> To be sure, the debtor tried to explain away his omissions. Without
> attempting to exhaust his litany of excuses, we note the appellant's claim that
> he and his attorney were rushed at the time of filing because they wanted to
> beat the effective date of the 1984 amendments to 11 U.S.C. § 522(d)(5)
> (which threatened to limit allowable exemptions). We are aware, too, of his
> entreaty that he made a clean breast of the joint venture arrangement, in all
> its ramifications, to his counsel-who, by oversight it is said, failed properly
> to complete the Schedules. We know of the debtor's contention that he
> brought the "closing binder" on the joint venture transactions to the § 341
> meeting (along with myriad other documents)-and that the trustee,
> presumably, could have examined it. And, we have considered his assertion
> that the holdback was not his asset, but was beneficially owned by Tully
> Disposal.

> The short answer to these plaints is that the bankruptcy judge-the factfinder
> of first resort, . . . considered them and found them wanting. The slightly
> longer answer is that these self-serving lamentations were, by and large,
> suspect. The original filing might have been accomplished in haste, but the
> later (amended) filings were done at the debtor's leisure-and fell well short
> of the requisite disclosure. Such a pattern is strongly supportive of the
> bankruptcy court's finding. *See* <u>In re Nazarian</u>, 18 B.R. 143, 147 (Bankr. D.
> Md. 1982) (even if hurriedness could satisfactorily explain inaccuracies in
> original schedules, "no carelessness could excuse the Debtor's failure to
> amend his schedules promptly when he had the leisure to do so"). The fact
> that the debtor came to the creditors' committee session chock-a-block with
> records of then-undetermined significance does not suffice to save the day.
> *A petitioner cannot omit items from his schedules, force the trustee and the creditors,
> at their peril, to guess that he has done so-and hold them to a mythical requirement
> that they search through a paperwork jungle in the hope of finding an overlooked
> needle in a documentary haystack.* Nor can an attorney's willingness to bear the
> burden of reproach provide blanket immunity to a debtor; it is well settled

that reliance upon advice of counsel is, in this context, no defense where it
should have been evident to the debtor that the assets ought to be listed in
the schedules. *See* Mascolo, 505 F.2d at 277 n. 4; In re Russell, 52 F.2d 749, 754
(D.N.H.1931); Nazarian, 18 B.R. at 147. A debtor cannot, merely by playing
ostrich and burying his head deeply enough in the sand, disclaim all
responsibility for statements which he has made under oath.

818 F.2d at 111 (footnote omitted, emphasis supplied).

Sohmer, unlike the debtor in Tully, did not amend his Schedules and Statement of

Financial Affairs.  Instead, he relies on the axiom that the provisions of 11 U.S.C. § 727

should be construed liberally in favor of the debtor and suggests that the myriad problems

with his Schedules and Statement of Financial Affairs are merely "technical and

conjectural."  The Court is unpersuaded by his arguments.  The Debtor's excuses easily fall

within the ambit of "self-serving lamentations" which must be rejected, particularly as his

veracity and credibility are suspect.  Evidence of his lack of integrity, such as his conduct

in violating the Commonwealth's restraining order and executing false HUD-1 Settlement

Statements, demonstrates his lack of credibility and undermines any excuse he may proffer

for the false oaths made on his Schedules and Statement of Financial Affairs and at the

section 341 meeting.  The Debtor's omissions, coupled with his "paperwork jungle," caused

the Trustee and Jalbert needless work in their attempts to ferret out assets and understand

his business affairs and the bankruptcy estate to incur needless expenses.   Indeed, the

condition of the Debtor's records could easily be construed as part of his effort to obscure

or conceal assets.  Sohmer's attempts to shift the blame for his conduct to them because

they failed to engage him in discussions about  his affairs are contrived and preposterous.

The Debtor's excuse that the Trustee took no action with respect to his personal injury cases after having been made aware of them before the filing of the Schedules and Statement of Financial Affairs, evinces desperation.  It certainly does not support the conclusion that he was excused from producing a complete and accurate list of his personal injury cases in his Schedules and/or  Statement of Financial Affairs and was entitled to keep his contingent fees from the proceeds from settlements of personal injury cases, which totaled $479,192.45.  The Court rejects the Debtor's implicit argument that because the Trustee did not question him about his Case Inventory the Trustee effectively abandoned any interest in the personal injury settlements and authorized the Debtor to utilize his contingent fees in any manner he saw fit, particularly as he minimized potential recoveries in the Case Inventory and the Trustee would have had no reason to suspect, within the first months of the case, that the Debtor omitted the most valuable cases from his list.  In other words, the Trustee's good faith belief that the Debtor was truthful cannot be used as a sword against him after discovery of the extent of the Debtor's deceit.

The Case Inventory produced by the Debtor was not signed under penalty of perjury and was not a substitute for a complete and honest disclosure of the Debtor's contingency fee agreements with his personal injury clients, which should have been disclosed on Schedule B or even Schedule G. The Case Inventory produced by the Debtor was incomplete and discounted the value of potential settlements.  It was not a full an complete disclosure.  The Debtor omitted the two cases which were settled for the largest amounts, one of which involved alleged child sexual abuse, hardly forgettable under any

38

stretch of the imagination.

The Debtor cites a decision in which the court determined that personal injury contingency fees cases were nonassumable executory contracts and not assets of the bankruptcy estate. *See* Tonry v. Hebert (In re Tonry), 724 F.2d 467 (5th Cir. 1984). While that case, which was decided under Louisiana law, may or may not be applicable under Massachusetts law, the case did not involve an objection to the debtor's discharge under 11 U.S.C. § 727. The ultimate issue in this case is whether the contingency fee agreements should have been disclosed, not whether the contracts were assumable - - an issue the Court could only determine after notice and a hearing. The Debtor's omissions of his contingency fee agreements and other assets warrants denial of his discharge under 11 U.S.C. § 727(a)(4)(A) and (D). The Debtor did not rebut the prima facie case submitted by the Plaintiffs.

E. Applicable Law under 11 U.S.C. § 727(a)(3)

In Razzaboni v. Schifano (In re Schifano), 378 F.3d 60 (1st Cir. 2004), the First Circuit articulated the standards for denial of discharge under 11 U.S.C. § 727(a)(3). It stated:

> Although this court has not yet squarely addressed the issue raised in § 727(a)(3), our sister circuits have described the standards for disclosure of records under the Act.
>
> > It is a question in each instance of reasonableness in the particular circumstances. Complete disclosure is in every case a condition precedent to the granting of discharge, and if such a disclosure is not possible without the keeping of books or records, then the absence of such amounts to that failure to which the act applies.

> Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir.1992) (citing In re
> Underhill, 82 F.2d 258, 259-260 (2d Cir.), *cert. denied*, 299 U.S. 546, 57 S.Ct. 9,
> 81 L.Ed. 402 (1936)). Therefore, "[w]hile a debtor may justify his failure to
> keep records in some cases, a discharge may be granted only if the debtor
> presents an accurate and complete account of his financial affairs." Alten, 958
> F.2d at 1230.

In re Schifano, 378 F.3d at 68.

The issue in this case is not whether the Debtor failed to preserve any books and

records, but whether the books and records he did maintain were in a condition to enable

the Trustee and parties in interest to ascertain his financial condition and business

transactions. The Plaintiffs cite Christy v. Kowalski (In re Kowalski), 316 B.R. 596, 602

(Bankr. E.D.N.Y. 2004), in which the court observed:

> In reviewing an objection to a discharge based on the debtor's failure to keep
> books or records from which the debtor's financial condition may be
> ascertained, the court must be mindful of the debtor's obligation in a
> bankruptcy case to reveal, rather than conceal, the complete financial picture.
> Thaler v. Erdheim (In re Erdheim), 197 B.R. 23, 29 (Bankr.E.D.N.Y.1996)
> citing In re Delancey, 58 B.R. 762, 767-768 (Bankr.S.D.N.Y.1986). Intent to
> conceal the Debtor's financial condition is not a necessary element to support
> an objection to discharge for failure to keep books and records. 197 B.R. at 29
> (citations omitted). When examining the debtor's circumstances, courts have
> focused on several factors, including:
>
> 1. Whether the debtor was engaged in business, and if so, the complexity and
> volume of the business;
>
> 2. The amount of the debtor's obligations;
>
> 3. Whether the debtor's failure to keep or preserve books and records was
> due to the debtor's fault;
>
> 4. The debtor's education, business experience and sophistication;
>
> 5. The customary business practices for record keeping in the debtor's type

of business;

6. The degree of accuracy disclosed by the debtor's existing books and records;

7. The extent of any egregious conduct on the debtor's part; and

8. The debtor's courtroom demeanor.

In re Kowalski, 316 B.R. at 601-02 (citing Krohn v. Frommann (In re Frommann), 153 B.R. 113, 117 (Bankr. E.D.N.Y. 1993)).

F. Analysis of Claims under 11 U.S.C. § 727(a)(3)

The Debtor was engaged in two businesses: a law practice and a mortgage foreclosure rescue business for which he received a fee, in most cases, of $15,000 per transaction. Although the Debtor kept separate files for each Timeless Funding transaction and kept accounting statements for those transactions, the accounting statements were not necessarily contemporaneous with actual receipts and disbursements and the Debtor commingled his receipts and disbursements from the Timeless Funding transactions with his law practice and his personal affairs using multiple accounts and producing a "paperwork jungle." See In re Tully, 818 F.2d at 111. In conjunction with the Timeless Funding transactions, the Debtor, with the complicity of Andrew Palmer, prepared false HUD-1 Settlement Statements which did not reflect the $15,000 Timeless Funding fee per transaction and did not accurately reflect that Sohmer, as the buyer of the Timeless Funding homeowners' properties, was contributing none of his own money for the acquisitions of the properties. From those false and misleading beginnings, the Debtor

41

constructed accounting statements for the Timeless Funding transactions which were neither contemporaneous nor complete, as the statements omitted dates, check numbers and references to the bank accounts used in conjunction with the transactions.

Jalbert testified that when he and a representative of the Trustee first visited the Debtor's law office they found utter chaos. He also testified that he and his accounting firm incurred fees in the sum of $47,515 to obtain and organize the Debtor's records, to establish amounts due from or to the Timeless Funding homeowners, to review and analyze the Debtor's various bank accounts, and to prepare necessary tax returns. He also testified that time was spent for which the estate was never charged and that the firm spent "north of 400 hours" making sense of the Debtor's books and records.

Although the Debtor kept books and records, the books and records he kept were wholly inadequate for the Trustee to understand his financial affairs without the expenditure of considerable time and effort. While the absence of records can conceal the Debtor's financial condition, a surfeit of disorganized, unreconciled, and commingled accounts can have the same effect. As a bankruptcy attorney engaged in complex legal and financial transactions, the Debtor's accounting system - - statements prepared using word processing software and an unreconciled QuickBooks software program - - was woefully inadequate for the complexity and volume of the Timeless Funding transactions, preventing the Trustee and his accountant from understanding the Debtor's finances within a reasonable amount of time. Although Jalbert was able to reach an overall understanding of the Debtor's financial affairs, deficiencies remained, and, as noted above,

the accounting statements were built on a bed of lies, namely the false HUD-1 Settlement Statements.

G. <u>The Debtor's Defenses under 11 U.S.C. § 727(a)(3)</u>

The Debtor maintains that the Plaintiffs' claims under 11 U.S.C. § 727(a)(3) are unsupported and contradicted by Jalbert's testimony.  The Court disagrees.  Although Jalbert indicated that he was able to determine the source of some of the funds pertaining to Timeless Funding transactions, the Debtor conveniently overlooks the vast amount of time and expense it took Jalbert to ascertain the Debtor's financial condition from his books and records.

**V. CONCLUSION**

In view of the Court's determination that the Plaintiffs have sustained their burden under 11 U.S.C. § 727(a)(3) and (a)(4)(A), and (D), the Court need not address the Plaintiffs' remaining counts under 11 U.S.C. § 727(a)(2) and (a)(5).  The Court shall enter a judgment in favor of the Plaintiffs on Count I of the Second Amended Complaint.  Count II under 11 U.S.C. §523(a)(2), (4), (6) and (7) is moot.

By the Court,

Joan N. Feeney

United States Bankruptcy Judge

Dated: July 20, 2010
cc: Jacqueline Welch, Esq., Paula R.C. Bachtell, Esq., Stephen F. Gordon, Esq., Harold B.
Murphy, Esq., Alec G. Sohmer